Case number 23-1708 Eoan Micula et al. v. Government of Romania, Advalence. Mr. Fine for the Advalence Government of Romania, Mr. Vasquez for the Appellate Eoan Micula. Good afternoon. We'll hear from you, Mr. Fine, whenever you're ready. Thank you, Your Honor. May it please the Court, my name is David Fine. I represent the Government of Romania with my co-counsel Ioana Seljanu. Your Honor, may I reserve two minutes for rebuttal? You may. All right. Although I do recognize the clock has seemed to be fairly flexible this morning and this afternoon. Welcome to our Court. I appreciate that. In order to avoid repiling the field, I'd like for the most part to rely on the argument that the Kingdom of Spain made in the previous two cases, particularly with respect to the effect of the January 25, 2022 order of the Grand Chamber of the Court of Justice of the European Union. Romania believes that Spain's position is correct. I will, however, note just a few points of distinction, things that came up during the course of the argument that may or may not matter to the Court, but that I think are important to note before going on to matters that are sort of important. First, I think that this case involves a bilateral investment treaty, a bit, between Romania and Sweden rather than a much broader treaty that involves a great many more parties. Second, it was not commercial. It was an investment treaty. Third, the CJEU, that highest court in the arbitration provision, that Romania did not have capacity to consent to arbitrate by the time this proceeding began. And finally, I'll note that Romania has actually paid the arbitration award. There is some dispute raised by the amiculous about whether Romania has paid the full amount, but Romania believes that it has now paid, in fact, that full amount. Now, with the Court's permission, I'd like to focus on two regards in which Romania's situation requires further discussion on top of the Kingdom of Spain's position, two points that the district court thought were relevant points of distinction. The first point was that the district court held that it was material that Romania entered into the bit with Sweden in 2002, that the amiculous demanded arbitration under that agreement in July of 2005, but that Romania formally acceded to the European Union in 2007. That fact, those sets of facts, are immaterial, and they're immaterial for two reasons. First, once Romania signed the EU's act of accession, which it did in April of 2005, Romania was bound to follow EU law, and that preceded by several months the demand for arbitration. The second point is that the bit itself was not an arbitration agreement. The bit was an invitation to arbitration, and the amiculous would accept that when they made their demand for arbitration. They accepted the demand for arbitration after Romania was bound to follow EU law because it had signed the act of accession. The other point is that even if the court regards the formal accession of Romania to the EU on January 1st, 2007 as the key date, we know that number one, the arbitration panel said that certain of the damages alleged by the amiculous occurred after that date, and we also know that the award by the arbitrators was after that date, and that award was effectively ultra-virus because there was no properly formed arbitration agreement. Mr. Fein, you're arguing as if this were all before us, you know, in the first time around, but we're viewing this all through the lens, and so it would be helpful if you'd focus on the Rule 60 arguments. For example, under Rule 60b-4, is it your argument that the district court's jurisdictional analysis was wrong from the start, or that even if it was correct at the time, it was rendered incorrect by the CJEU's decision in European Foods? Thank you, Your Honor. The answer is that the decision was wrong ab initio when it was made in 2019, and the judgment was entered to enforce the arbitration award. It was made particularly clear after CJEU decisions in January and then later in 2022, in which that body charged with interpreting European law, EU law, said that this particular agreement and the language that the court used was, pardon me while I find it, the court held that the system of judicial remedies provided for by the EU and FEU treaties replaced that arbitration procedure and the consent given to that effect by Romania from that time onwards. Don't you have to show that there was not even an arguable basis for jurisdiction from the original? Your Honor, I'm sorry, Your Honor, I didn't mean to interrupt you. No, Your Honor, I don't think that I do, although I could. The reason I don't think that I need to is because I think that Judge Mehta erred and should have applied the de novo standard of review. If you look at this court's opinion and, in fact, Judge Rogers' decision in Bell Helicopter. Isn't Bell Helicopter distinguishable because that was a default judgment proceeding? So the country didn't have a chance to raise any arguments at all, which is different here. Well, that is a distinction, but for our purposes, I don't think it's a meaningful distinction. Would Romania agree that there was jurisdiction the first time around? I'm sorry? I thought Romania agreed that there was jurisdiction. No, Romania, when it answered the petition after service issues are finally resolved in the district court in the confirmation proceeding, Romania raised the arbitration question under the Acme decision. No, no, I'm saying the original judgment. That's what I'm talking about, Your Honor. On November... No. No, respectfully, it was not. But let me go back to Bell Helicopter. You'll have a look of inquisition on your face. Many, but we'll have... Go ahead, go back to Bell Helicopter. Thank you, Your Honor. In Bell Helicopter, the court spoke about the... The court said that there is an arguable basis determination and standard of review, but there's an exception when the issue is sovereign immunity. And that's Judge Rogers' decision. And this is, of course, an issue of sovereign immunity. And so, therefore, we believe that the court should be applying, the district court should have applied the de novo standard of review and revisited entirely the question of that court's jurisdiction under the FSIA. Now, even if there were an arguable basis evaluation, Your Honor, I think that Romania still has a strong argument, but I don't think that we have to go there. But haven't we already decided this issue? I mean, we decided a few years ago in didn't join the EU until after the underlying events, arbitration agreement applied. So why isn't... I mean, the district court followed that. Right. What's giving you the basis under Rule 60B? Under Rule 60B4, the original judgment was void. And the reason why this court's earlier... the earlier decision, that's what I'll do, I promise, Your Honor. And that is that at that time, there was not a decision in the case of Themiculus and Romania from the EU that definitively said for purposes of EU law that it was improper state aid and that Romania did not have capacity to consent to arbitrate with Themiculus. That was a new fact that was not before this court and that had not previously been before the district court. And those are, in fact, important points. Now, Your Honor, just to go back, the pinpoint site, by the way, for Bell Helicopter and the point about sovereign immunity being an exception to the arguable basis point. And this was wholly apart from whether the party had or had not appeared. Obviously, in Bell Helicopter, the Republic of Iran had not appeared. But the language of the court was that the arguable basis standard generally applied if the movement had appeared in the earlier action. However, quote, an exception exists where the issue of the waiver of sovereign immunity is at issue. And at issue is my own language. So I think that this is a different... You said you were going to have the pin site. You're at 11... 1182, Your Honor, in the Bell Helicopter decision. And the Bell Helicopter decision is also important for another point. And that is that Bell Helicopter tells us that judgments in excess of subject matter jurisdiction are not voidable, but simply void. And that's 1180 in that opinion. And that's exactly the case here. The judgment of the court here, recall, of course, that the FSIA starts with a presumption of immunity and you have to overcome it by proving the existence of an exception. And here, the only exception relied upon was the arbitration exception. And we now know from the CJEU that the arbitration provision was void ab initio. And in fact, there was no arbitration agreement formed because Romania did not have capacity to do so. It could not give consent by the time the Mikulas began. Under Bell Helicopter... Sorry, it does appear that Mikula conceded that there was jurisdiction under FSIA when it appealed the prior judgment. It's at 805 Federal Appendix at 1. As Romania now agrees, the district court properly invoked the FSIA exemption for actions to enforce arbitration awards. So you conceded that, which makes you different from Bell Helicopter, for sure. Well, it is a different circumstance. And there are two answers I would give to that, Your Honor. It's also in your brief. JA 1828, the district court had subject matter jurisdiction over Mikula's petition to confirm the arbitration. I understand that, Your Honor. I understand that. Of course, it's subject matter jurisdiction. And subject matter jurisdiction cannot be waived. There were, to be candid with the court, certain political considerations that underlay the determination not to pursue that particular issue. But the bottom line is that Romania raised the issue of FSIA immunity and the failure of the arbitration provision before the district court in that original proceeding, its docket number 51, and its response to the Mikula's petition for enforcement. I just think that this does distinguish you from Bell Helicopter. And you conceded that there was jurisdiction on appeal. And we're in a Rule 60B situation here. I understand that, Your Honor. And again, I don't think that a party can concede subject matter jurisdiction in the federal courts. But it affects the standard of review that distinguishes us from Bell Helicopter. You have to show an arguable basis. Your Honor, I don't think on that regard it does, in fact, distinguish Bell Helicopter. Your Honor, may I go ahead? I'm sorry. I know I'm talking over the clock here. Back on the question about why our prior decision isn't binding, you mentioned the subsequent CJEU decision. So that's what you're relying on. Yes, Your Honor. And I'm sorry, may I answer Judge Pant? Yes. I don't mean to interrupt. I just want to make sure not to leave Judge Pant's question unanswered. The answer to that question, Your Honor, is that in Bell Helicopter, the only thing the court said was its arguable basis unless it deals with sovereign immunity. Didn't say anything about conceding anything. And if it deals with non-arguable basis, you'd have to read something more into Bell Helicopter to find that anything that Romania said in its appeal document somehow changes that review for purposes of Rule 60b-4. I'm sorry, Judge Heller, did you have? I was just going to say, under EU law, it seems like your key premise of your argument is that the arbitration agreement became void the looking at the Court of Justice of the EU opinion, it said that Romania's standing offer to arbitrate was void and that the arbitral award is invalid and unenforceable. But does that mean that the already completed arbitration agreement became void? I don't see that in the Court of Justice opinion. Your Honor, I think you've misunderstood our position and perhaps I've not explained it well, so I'll take a run at it from a little different direction just if I can offer some clarity. The point is this, the bit in this case, like we heard about other days, did not in fact say we agreed to arbitrate. What it said was there's sort of an outstanding offer to arbitrate and the way you can accept as an investor, and it makes sense, right, because the bit is between Romania and Sweden. So to create the arbitration agreement, the investor, the miculous here, had to come forward and demand arbitration. That's the formation of the arbitration agreement. That occurred in the summer of 2005. But earlier in 2005, Romania had signed the Act of Accession as part of the process of joining the EU and agreed to follow EU law, which meant, according to the CJEU in its decision two years ago, that meant that from that point forward, from when Romania signed the Act of Accession, it did not have the arbitration. So there was never an agreement for, and that's the issue for our present purposes. It's a formation question, which is for the courts, and when you say for the courts, that really means it's for the European courts, for the EU's highest court, and in this case, that's of course the CJEU. Well, wasn't there a point about when the events at issue took place as well? I'm sorry, Judge Rogers, I didn't quite hear you. I apologize. Wasn't there also the distinction about when the events at issue took place? Well, Your Honor, I don't know what it would be in distinction from, but I do know that the CJEU- In other words, before Romania had joined the EU. No, Your Honor. Only some of the events occurred prior to Romania's joining the EU. But the- Well, I said only some. The CJEU held that there were some actions for which the amiculous sought damages that occurred after that date. So there's both. And if Your Honors have no further questions, I'll, so to speak, reserve my time for rebuttal. Fine. Thank you. Thank you, Your Honors. Good afternoon, Mr. Vasquez. Good afternoon. May it please the court. I am Frank Vasquez. I'm here to argue on behalf of the Petitioner Appellees. I'm here with my colleagues, Jackie Chung and Hannah Rubashkin, and also my co-counsel, Anthony Ullman. In the district court's most recent decision, in the first sentence, he characterized this case as a seemingly never-ending saga. And I think that that kind of summarizes where we are. And I think you've already alluded to the fact that we are not in the same kind of posture or position as the other cases that you've been hearing today. And if you just review the four appeals, this is the fourth. The first one, we had the original judgment. And as Judge Pan observed, Romania did concede jurisdiction during that appeal in its papers. And this court observed that and affirmed the decision. In the second appeal, there was an argument by Romania that it had satisfied the judgment by making a partial payment. That motion was denied, and this court then affirmed that. In the meantime, the district court also sanctioned Romania for failing to comply with discovery. The third appeal, there was a judgment on accrued sanctions was entered, and sanctions continue to accrue. Romania remains in contempt of Judge Maida at the district court level. And Romania argued that it should have a stay of discovery. This court also affirmed that decision. Romania's motions were rejected. And now we're here on the fourth appeal, where Romania is now attacking the judgment under Rule 60. In our mind, and Judge Pan, you alluded to this, this is kind of like Spain saying, we don't want to pay. And that's our position is that all of this litigation, which has been going on for 10 years, so that I've been involved with it, it's been going on much longer than that, that Romania does not want to pay. One of the other things that happened, though, more recently, that also goes to Romania's concession of jurisdiction, is that Romania went back to ICSID. Romania went back to ICSID on a request for an interpretation of the award. And in doing so, Romania submitted to the jurisdiction of a reconstituted tribunal. We had that hearing last May. That decision was rendered in our favor in December, and we filed it as a supplemental authority on January 2nd. So there is further evidence that Romania has, in fact, conceded that the ICSID tribunal had jurisdiction over it to decide and issue the award that then needs to be enforced under the ICSID statute. I'm interested in your Rule 60 arguments. On Rule 60B, you say that Romania's motion is time-barred under Kemp v. United States because it's based on a judge's error of law. But doesn't that reading of Kemp swallow the rule? Is there any example of a void judgment that is not the product of an error of law? No, not that I can point to on that. We did add that argument as a supplemental argument. Our principal argument is simply that the arguable basis standard applies and the judge correctly decided in the first case and also decided correctly following that. One other thing I think that needs to be clarified is we've heard from the European Commission today and also opposing counsel about the status of the CJEU and General District Court case. It's still going on. In fact, the parties will be presenting arguments next week in that case. That CJEU decision was really just a remand to the General District Court for further proceedings. And those are ongoing and that will be argued next week. And all of many of these issues are on the table there, including whether this is state aid, including these timing issues about when the damages accrued. How does that bear on the appeal of the Rule 60 motion denial before us? The only way it bears on it is I think there was a mischaracterization that that was some kind of final pronouncement by the Court of Justice. So to the extent of that any based on that being a final order, it's not. It's still ongoing. We don't believe it's relevant ultimately simply because, as Judge Maida found originally and subsequently, that the agreement to arbitrate originated before the Romania ceded to the EU. The other issue that this case has been going on for so long... I have another just specific Rule 60 question, which is what's the standard of review? You say in your brief at one point that for the question whether the judgment was based on an earlier judgment that was vacated or reversed, we should review that for abuse of discretion. I wonder if you have authority for that. I would have thought that would be a question subject to de novo review. Under 64 or 65, District Court denied the motion to vacate the judgment as based on an earlier judgment. Well, there has not been an earlier judgment that's been reversed or vacated. But the standard of review, de novo or abuse of discretion? You say abuse of discretion. I'm just not sure. We think it should be an abuse of discretion, but the result would be the same either way. So what I was saying about those proceedings ongoing is that they... Actually, what I was talking about earlier was this case has been going on for so long, it predates the Stilix case. So the original judgment did not have the benefit of this court's layout of how that decision should be decided. In fact, we think the court went beyond what needed to do originally in terms of establishing jurisdiction. And as we've heard in earlier arguments today, that would be really established by the ICSID statute itself and the existence of ICSID 28 U.S.C. 1650A with those agreements that the court, in fact, did not need to go into the analysis it went into. It was, I think, convenient for the court to do that. It was consistent with the arguments that we've been making in the European Union about this because we're trying to enforce this judgment in multiple jurisdictions. But in terms of how the court needs to decide this issue, we think the court went above and beyond what it originally needed to do. You're talking about the district court? The district court. And so I just want to make that clear that if this case were to be brought again, there would be additional arguments based on precedent that was not available. So just to put it on the table, Professor Dave, the narrowest ground on which you could prevail in your view that you think would suffice would be? Well, the narrowest ground would simply be the ground that the court articulated originally, which was that Romain was not a member of the EU. So all these arguments about EU law applying and having something to do with or to obviate or to go against the arbitration agreement or to negate it are just not available because the EU law did not apply. When you say the ground that we already rule on, you mean this court? Well, both this court in the first appeal and what the district court did in making that determination in this court affirming the new information or CJAU decisions did not change that analysis, as the court just most recently found. We think the broader view would simply be that all of those questions are irrelevant and the jurisdiction could have been found simply straight on the statutory authority of the exit statute. Thank you. Do my colleagues have further questions? Thank you, Mr. Vasquez. Thank you. Mr. Fine, you have two minutes for rebuttal. I take that particularly seriously when I see you start to gather your materials. It's a very subtle hint, Your Honor. I have four points to make and, of course, I'd love to answer any questions that the court has. The first is just to remind the panel, Romania has paid in full what it understands under the Mikula's calculations the award to be. So this isn't somebody trying to avoid paying an award, although honestly, Romania doesn't think it should have had to, but it has. The second point is that Mr. Vasquez refers to ICSID. That wasn't consent. That was because, number one, it was instructed to do so, and number two, Romania was trying to get clarification about what its obligations were under the award. That doesn't mean that it consents to it any more than it consented to be brought into the district court here. It had to answer. The third thing is that the Kent case is of no value to the Mikulas for what I think is the very reason Judge Pillard, you mentioned, which is what the Supreme Court said there was that if you're just saying the judgment was void because the judge was mistaken, that falls into B1, and that's a mistake, and that's got a one-year thing. But here we're talking about something very specific. The judgment was void because under Bell Helicopter, the judgment was void. There was no subject matter jurisdiction. The specific rules over the general. The fourth thing is on the standard of review, these are all issues of law for which the court's standard of review is plenary. And let me finally just note that the situation in which Romania has found itself is candidly intolerable. Romania is bound by EU law. It has been ordered not to make these payments because the EU, the EC in particular, regards them as state aid. It's having orders from the district court in the United States telling it, you must do that. It's being told by the EC, don't do it, and by the way, call back what you've already paid to the Miculas. That's not a situation in which Romania should find itself. And moreover, these are European parties, all of them. The interests there are European. They are European member states, and it should be determined according to EU law. In this dispute, courts of the United States do not have an interest. We ask that the court vacate the judgment below and remand with instructions for the district court to grant Romania's Rule 60B motion and vacate the judgment of September 11, 2019. Thank you very much. And thank you, Your Honors. The case is submitted.
judges: Pillard, Pan, Rogers